# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| LAWRENCE WILLIAMS, <br><br> Plaintiff, <br><br> v. <br><br> EAST-WEST UNIVERSITY, <br><br> Defendant. | No. 17 CV 7092 <br><br> Judge Manish S. Shah |

## MEMORANDUM OPINION AND ORDER

Lawrence Williams claims that East-West University, his former employer, violated his civil rights. The university says that Williams released this claim when he signed a severance agreement. Williams admits that he signed the agreement (but denies that it is binding) and admits that the university paid him shortly after he signed (but says he is not sure why). The university moves for judgment on the pleadings as to all counts.

### I. Legal Standards

The same standard applies to both motions to dismiss and motions for judgment on the pleadings. Fed. R. Civ. P. 12(c); *Buchanan-Moore v. Cnty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009). Under that standard, the facts in the complaint are taken as true, *Pleva v. Norquist*, 195 F.3d 905, 909 (7th Cir. 1999), and viewed in the light most favorable to the nonmoving party. *N. Indiana Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 452 (7th Cir. 1998). The question is "whether there is any set of facts consistent with [the] allegations that would give

rise to a right to relief." *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005), *as amended on denial of reh'g and reh'g en banc,* (Aug. 11, 2005).

Motions for judgment on the pleadings are, as their name implies, based on the pleadings alone. *See* Fed. R. Civ. P. 12(c). Pleadings include the complaint, the answer, and any documents attached as exhibits. Fed. R. Civ. P. 10(c); *N. Indiana Gun*, 163 F.3d at 452–53. If matters outside the pleadings are presented and a court considers those matters when deciding a Rule 12(c) motion, the motion must be converted into a motion for summary judgment, and the parties must be given an opportunity to present all pertinent material. Fed. R. Civ. P. 12(d). There are two applicable exceptions: first, if the complaint references a document that is "central" to plaintiff's claim and defendant attaches that document to their Rule 12(c) motion, a court may consider it. *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012). Second, when opposing a Rule 12(c) motion, a plaintiff "may submit materials outside the pleadings to illustrate the facts the [plaintiff] expects to be able to prove," so long as those "new elaborations" are consistent with the complaint. *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012); *Bishop v. Air Line Pilots Ass'n, Int'l*, 900 F.3d 388, 399 (7th Cir. 2018).

## II. Facts

Plaintiff Lawrence Williams, a college-educated black man, was diagnosed with multiple sclerosis six years into his employment with Defendant East-West University. [19] ¶ 11, 13.[1] Following his diagnosis, Williams alleges that the

---

[1] Bracketed numbers refer to entries on the district court docket.

university prevented him from accessing treatment for his disability, passed him up for promotions because of his race, and retaliated against him when he complained to the EEOC. [19] at 4–6. All of this, Williams says, was discriminatory conduct in violation of federal law. *Id.* The university disagrees. [25] at n.3.

The focus of this motion, however, is a contract. The university terminated Williams on February 3, 2017, and, as part of that termination, offered Williams a severance package memorialized in a "Separation Agreement and General Release." [19] ¶ 29, 31. *See also* [23-1]. The agreement purports to waive various rights in exchange for a one-time, lump-sum payment. [23-1]. In pertinent part, the agreement ([23-1] at 1) reads:

> If you accept this Agreement by signing below on or before February 10, 2017, East-West will pay you severance of $1,971.15 (gross salary) which is equal to 2 weeks of pay.
>
> . . .
>
> In signing this Agreement, you release, compromise, waive and discharge the East-West from and regarding any actual or potential claims you may have arising out of your employment, or the termination of your employment, and any other claims that you have or may have at the time you sign this letter. The claims that you would be waiving include, for example, discrimination claims under . . . Title VII of the Civil Rights Act of 1964 and any other federal, state or local employment or antidiscrimination law, contract, common-law and tort claims.

The parties dispute whether Williams ever accepted the settlement. The agreement explicitly offers four methods by which Williams "can" accept and, at the same time, "asks" that he accept via a fifth: Williams (1) can "accept [the] Agreement by signing below on or before February 10, 2017," (2) "can either . . . mail [the] signed

3

Agreement . . . to Dr. Madhu Jain"; (3) "or . . . email a signed copy of [the Agreement] to Dr. Madhu Jain"; and (4) "can email . . . a signed copy of [the Agreement] to [Chancellor Khan]." [23-1]. At the same time, the university (5) "ask[ed] that [Williams] sign this [Agreement] and return it to [Chancellor Khan]." *Id.* The agreement did not require notarization and did not allow Williams to revoke. *See id.*

Williams chose a sixth option: he signed the agreement in the spot marked for the notary public and left a copy with a colleague in the Human Resources department, instructing her not to deliver the agreement until Williams had time to consult with a lawyer. *Id.* ¶ 32, 40; [23-1] at 2. When he later requested that his colleague return the agreement, she told him that it had been "'stolen' from her desk." *Id.* ¶ 43. According to the university, Williams' colleague willingly turned the agreement over to her supervisor. [23] ¶ 32. Either way, a copy of the agreement bearing Williams' signature ended up in the university's hands.

The parties also disagree about money. On February 17, 2017, the university direct-deposited $1,971.15 into Williams' bank account—the exact amount due under the agreement—and issued a pay slip for 80 hours of work (i.e., "2 weeks of pay"). [23-2]. *See also* [19] ¶ 46. Williams acknowledges that the university "claimed" the money was "from" the agreement, [19] ¶ 46, but implies that he thought the university was paying him for (among other things) days he worked prior to being terminated. [33] at 9; [19] ¶ 46 (alleging that he was, at that time, still "expect[ing] several sources of income, including federal tax refund, state tax refund, last pay period, and refunded shares from the Defendant"). To substantiate this belief, Williams points to a message

4

from his payroll manager on February 17, 2017, wherein, at 8:07 p.m., she wrote, "[s]he paid you for the week you worked/and you'll get your severance pay next pay day.. [sic] I think *next* week." [33-1] at 3 (emphasis added).[2]

Neither party alleges that Williams returned the $1,971.15. The university alleges that Williams had still not returned the $1,971.15 as of the date the university filed the present motion (more than sixteen months later). [34] at 12–13.

A few days after receiving $1,971.15 from the university, Williams filed a second EEOC charge focusing on the discriminatory conduct at issue in this case. [8]. The EEOC dismissed that charge, and Williams filed this complaint. [8] at 2; [1].

## III. Analysis

The university's motion presents questions of fact that cannot be decided at this stage in the proceedings. It is too early to hold that Williams intended to accept the agreement when he left a signed copy with his trusted colleague and, similarly, it is too early to hold that Williams intended to ratify the agreement, because he could still produce facts tending to show that a reasonable person might have believed the February 17 payment was not his severance, but something else.[3]

---

[2] The exhibit attached to Williams' response to the university's motion is not inconsistent with any of Williams' allegations in the complaint and can be considered without converting the motion to one for summary judgment. *Bishop*, 900 F.3d at 399.

[3] The other arguments raised in the briefs are not dispositive. First, it is too early, despite the university's invitation, to hold that Williams' first EEOC charge precludes claims regarding potentially-related conduct. In order for two EEOC charges to be "reasonably related," the charges must describe the "same conduct and implicate the same people." *Kerstig v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1118 (7th Cir. 2001). It is not apparent from the pleadings that the first charge involved the same people and same conduct. Second, Williams was not fraudulently induced. Fraudulent inducement requires, among other things, "a false representation of material facts . . . made by one who knew or believed the representation to be untrue." *Trautman v. Knights of Columbus*, 121 Ill.App.3d 911, 914 (1st

5

## A. Williams Can Produce Facts Showing that he Objectively Manifested an Intent not to be Bound by the Agreement.

The agreement is a release, and a release is a type of contract. *Capocy v. Kirtadze*, 183 F.3d 629, 632 (7th Cir. 1999). Illinois law governs its interpretation. *Id.* For the agreement to be binding, there must have been an offer, consideration, and acceptance. *Brody v. Finch Univ. of Health Scis./The Chicago Med. Sch.*, 298 Ill.App.3d 146, 154 (2nd Dist. 1998). The parties disagree only about acceptance. [33] at 6.

Acceptance is a matter of intent. Intent is "crucial to the determination of whether a contract came into existence." *Lakshman v. Vecchione*, 102 Ill.App.3d 629, 632 (1st Dist. 1981). A "meeting of the minds" is so "essential" that even a signed contract is not binding without it. *Quinn v. Daly*, 300 Ill. 273, 277 (1921); *Chicago Title & Tr. Co. v. Ceco Corp.*, 92 Ill.App.3d 58, 69–70 (1st Dist. 1980) (signed contract not binding where parties intended that delivery was precondition to acceptance); *Farley v. Roosevelt Mem'l Hosp.*, 67 Ill.App.3d 700, 704–5 (1st Dist. 1978) (the

---

Dist. 1984). If Williams had alleged that his trusted colleague was in on a ruse to get him to sign and deliver the contract, and that she took steps to mislead him as to the terms of the agreement, he might have alleged fraudulent inducement. But there is no such allegation, nor any facts in the pleadings tending to suggest such inducement. In other words: plaintiff was not "fraudulently induced" into accepting the agreement—his argument is that he never accepted it in the first place. Third, the agreement is not barred by the Age Discrimination in Employment Act (29 U.S.C. § 623 et seq) or the provisions of the "Older Workers Benefit Protection Act" (OWBPA); those restrictions and limitations apply only to people forty or older. 29 U.S.C. § 631(a). At the time of the conduct in question, Williams was no older than thirty-eight. [19] ¶ 11. And fourth, the agreement is not ambiguous as to the date acceptance was required: "by February 10" means any time on February 10. Additional provisions—such as, "by 5:00 p.m. on February 10"—cannot be read into the agreement. *Knapp v. Knapp,* 303 Ill. 535, 538 (1922) (courts do not read into contracts provisions that the contracts do not contain).

execution of a contract is not always synonymous with its creation; it can, for instance, be a "matter pertaining to the performance of the contract").

Delivering a contract is often an expression of an intent to be bound, but not always. The key is whether the party's conduct amounts to an "objective manifestation of mutual assent." *McCarty v. Verson Allsteel Press Co.*, 89 Ill.App.3d 498, 510 (1st Dist. 1980); *Steinberg v. Chicago Med. Sch.*, 69 Ill.2d 320, 331 (1977) ("the conduct of the contracting parties" can be enough to "indicate[] an agreement to the terms of the alleged contract"); Restatement (Second) of Contracts § 19 (1981). Parol evidence is "always competent" to show that the agreement never became effective in the first place; in fact, the question "depends upon proof by parol." *Jordan v. Davis*, 108 Ill. 336, 342–43 (1883).

Williams may have signed and delivered the agreement, but he has sufficiently alleged that, while doing so, he objectively manifested an intent *not* to be bound. According to the pleadings, he delivered the contract to an intermediary, not the other parties to the contract, [19] ¶ 32; he told that intermediary (a trusted colleague) to not deliver the signed copy to the other individuals referenced in the agreement, [19] ¶ 40; there is a message from the colleague corroborating that story, [33-1] at 3 (when Williams says, "[d]o not turn in that termination form I do not agree with it," his colleague says, "I know, I kept it already"); he gave a reason why he asked her to hold on to it (so that he could consult an attorney), [19] ¶ 32; he later called the trusted intermediary "several" times to ask her to return the agreement so that it would not become binding, [19] ¶ 42; he provided an explanation for how the other parties to

7

the agreement came to possess it without his permission, [19] ¶ 43 (he says it was stolen and backs that up with a written exchange tending to support that conclusion, [33-1]); and later emailed the university to tell them he did not sign the agreement.[4] [19] at ¶ 39.

If the agreement had required that Williams accept by taking a specific action, Williams would only have been able to indicate his intent to accept by taking that action. *See Soderstrom v. Rock River Valley Pigeon Club, Inc.,* 122 Ill.App.3d 819, 820 (3rd Dist. 1984) ("delivery is not an essential element to the formation of a contract unless the offer specifies actual delivery as an essential part of acceptance of the offer"). But this agreement did not require a specific means of acceptance: in permissive terms, it presented Williams with four options and, at most, politely requested that he consider a fifth.[5] *See* [23-1]. Although it provided for a notary's certification, it did not require that he sign in the presence of a notary. *See* [23-1]. *Knapp,* 303 Ill. at 538 (1922) (courts do not read into contracts provisions that the

---

[4] This was not true; Williams did sign the agreement. [19] at ¶ 32; [23-1]. But telling Dr. Jain and Chancellor Khan that he had not signed the agreement is more indicative of an intent not to be bound than it is indicative of an intent to be bound.

[5] At one point, the agreement says Williams "can either" accept by mailing *or* emailing a signed copy of the agreement to Dr. Jain. Williams argues that, as a result, the contract requires acceptance to be via one of those two means and *only* via one of those two means. [33] at 6. But the rules of contract construction require giving a phrase that meaning which brings it into harmony with the rest of the contract. *In re Halas*, 104 Ill. 2d 83, 92 (1984). Reading "can either" to exclude the other means of acceptance explicitly authorized by the agreement would result in disharmony: if Williams *can only* accept by either mailing or emailing a signed copy to Dr. Jain, then he *cannot* also accept by mailing a signed copy to Chancellor Khan—yet the agreement explicitly gives him that option, too. [23-1] (Williams "can email . . . a signed copy of [the agreement] to [Chancellor Khan].")

8

contracts do not contain). Delivery via an intermediary was not contrary to any of its terms, and the agreement cannot be disregarded on that basis alone.

Nonetheless, the pleadings do not establish that Williams objectively manifested an intent to be bound. Often, one accepts the terms of a severance agreement by signing it and handing it to an HR representative. Here, Williams has sufficiently alleged that his conduct did not reflect an intent to agree.

### B. Williams Can Produce Facts Showing that a Reasonable Person Could Conclude that he did not Intend to Ratify the Agreement.

Williams says he believes the university still has not paid him under the agreement. According to most of the facts in the pleadings, this belief is not only incorrect but unreasonable. But because Williams could produce facts showing that a reasonable person might have been confused as to the source of the payment he received on February 17, 2017, the university is not entitled to judgment on the pleadings.

Public policy favors settlement, but first there must be an accepted or ratified agreement. Ratification, like acceptance, is a question of intent. In general, a severance agreement is ratified when someone with knowledge of the facts entitling them to rescind retains the consideration due under the agreement "for an unreasonable time under the circumstances of the case." *Golden v. McDermott, Will & Emery*, 299 Ill.App.3d 982, 993 (1st Dist. 1998). *See also Hurd v. Wildman, Harrold, Allen & Dixon,* 303 Ill.App.3d 84, 94 (1st Dist. 1999) (release ratified where employee accepted salary and benefits for three years after signing); *Rohr Burg Motors, Inc. v. Kulbarsh*, 17 N.E.3d 822, 838–39 (1st Dist. 2014) (release ratified where plaintiff

9

informed defendant that money had been sent in satisfaction of the agreement and where defendant received check, cashed it, and did not return the proceeds).

The test is an objective one: The "ratifying act must be such that reasonable minds would say that by his or her acts, he or she must have intended a ratification of the release." 66 Am. Jur. 2d Release § 27. The question of intent is a question of fact. *Fletcher v. Marshall*, 260 Ill.App.3d 673, 675 (2nd Dist. 1994) (question of intent properly decided where there was "no evidence on record that could give rise to a reasonable inference" that defendant did not intend to ratify).

It certainly looks like Williams intended to ratify the agreement. He knew that the agreement promised him a specific (and recognizable) amount of money: $1,971.15, or two weeks' pay. [23-1]. Williams also does not dispute that, roughly one week after a signed copy of the agreement went missing from his colleague's desk, that exact amount was direct-deposited into the same account where he normally received pay from the university. *See* [19] ¶ 46; [23-2]. He even acknowledges that the university told him this money was from the agreement. [19] ¶ 46. And if he had glanced at his pay slip for February 17, 2017, he would have seen that it purported to reimburse him for 280 hours worked since the new year—two weeks' worth of hours above and beyond the 200 hours that he was due as of the date of his termination (assuming he worked 40 hours per week for the five weeks prior to February 3, 2017). [23-2]. If Williams returned the money or thought to inquire about it at some point after he filed his second EEOC charge, he has said nothing about it. The university says he still has the money. [34] at 13.

Nonetheless, there remains a question of fact as to Williams' intent. Williams alleges that he was expecting "several sources of income" following his termination (including amounts due from his last pay period, as well as from "refunded shares from the Defendant"). [19] at ¶ 46. His assertions of uncertainty are not entirely unfounded: on the day the payment was made, his payroll manager told him that his severance payment was still a week away. [33-1]. Nor was his subsequent conduct entirely inconsistent with that understanding: only a few days after receiving the money, he filed a claim of the exact type released under the agreement. [19] ¶ 7. And at least according to the evidence in the pleadings, Williams has plausibly asserted that he only received one payment after his termination—not the two payments a reasonable person might expect if they were expecting one for their last week of work and an additional payment under the agreement.[6] Because there remains a question of fact as to Williams' intent in retaining the February 17, 2017, payment, the university's assertion that he ratified the agreement cannot be decided on the pleadings alone. The release of a claim is an affirmative defense; the university will be permitted to develop the facts through discovery and revisit the defense at a later stage in the litigation.

---

[6] Williams will face an uphill battle pressing this argument forward. In Williams' response, Williams asserted that he never received a second pay check after his termination. [33] at 12. But the university appears to have attached to their reply a copy of a second pay stub (from February 10, 2017) purporting to deliver one weeks' worth of pay to Williams. This pay stub strongly suggests that Williams was paid twice following his termination and undermines Williams' sole remaining argument against dismissal. But the university's evidence falls outside the scope of consideration on a motion for judgment on the pleadings.

## IV. Conclusion

The university's motion for judgment on the pleadings, [24], is denied.

ENTER:

　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　Manish S. Shah
　　　　　　　　　　　　　　　　　　　United States District Judge

Date: September 25, 2018