UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LAWRENCE WILLIAMS, | |
| Plaintiff, | |
| v. | Case No. 17-cv-07092 |
| EAST-WEST UNIVERSITY, | Judge Martha M. Pacold |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Lawrence Williams sued his former employer, East-West University ("EWU"), alleging discrimination on the basis of disability in violation of the Americans with Disability Act (Count I), and both discrimination on the basis of race and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. (Counts 2 and 3). EWU now moves for summary judgment on all claims. For the reasons stated below, the motion [51] is granted.

**Background**

In deciding EWU's motion for summary judgment, the court views the evidence in the light most favorable to Williams. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The following facts are undisputed unless otherwise noted.

EWU hired Williams, a black man, in 2003.[1] EWU terminated Williams on February 3, 2017. Pl.'s Resp. DSOF, [58] ¶ 5. Williams's supervisors, Dr. Madhu Jain, Dr. Wasi Khan (Chancellor of the university), and Zafar Malik, held a meeting with Williams on that date and told him he was being discharged. DSOF, [53] ¶¶ 42, 43. They also offered Williams a severance package, as laid out in the "Separation Agreement and General Release." [53] ¶¶ 42, 43.

---

[1] Bracketed numbers refer to entries on the district court docket and are followed by the page and / or paragraph number. Page numbers refer to the CM/ECF page number. Citations to the parties' Local Rule 56.1 Statements of Fact are identified as follows: "DSOF" for EWU's Statement of Facts, [53], "PSOF" for Williams's Statement of Additional Facts, [58] at 12–17, "Pl.'s Resp. DSOF" for Williams's Response to EWU's Statement of Facts, [58] at 1–12, and "Def.'s Resp. PSOF" for EWU's Response to Williams's Statement of Facts, [69].

The agreement was a two-page letter from Dr. Khan to Mr. Williams. [53-14] at 2-3. The agreement offered a one-time, lump-sum payment in exchange for a waiver of various rights. *See* [53-14] at 2. In particular, it specified:

> If you accept this Agreement by signing below on or before February 10, 2017, East-West will pay you severance of $1,971.15 (gross salary) which is equal to 2 weeks of pay. . . .
>
> In signing this Agreement, you release, compromise, waive and discharge the East-West [*sic*] from and regarding any actual or potential claims you may have arising out of your employment, or the termination of your employment, and any other claims that you have or may have at the time you sign this letter. The claims that you would be waiving include, for example, discrimination claims under . . . Title VII of the Civil Rights Act of 1964 or any other federal, state or local employment or antidiscrimination law, contract, common-law and tort claims.

[53-14] at 2.

Various portions of the agreement also described how Williams could accept the agreement, namely, by both (1) signing and (2) returning the signed agreement, although the agreement gave a number of ways in which Williams could return it:

> If you *accept this Agreement by signing below* on or before February 10, 2017, East-West will pay you severance of $1,971.15 (gross salary) which is equal to 2 weeks of pay. However, *if you have not communicated your acceptance of this offer by February 10, 2017, this offer automatically expires at that time*, and East-West is not required to take any further action to rescind or otherwise withdraw the terms of this Agreement. *You can either mail your signed Agreement or email a signed copy of this letter to Dr. Madhu Jain at madhu@eastwest.edu.*
>
> The East-West's policy for separation agreements is to obtain a release waiving all claims. *If you want to accept the separation package, we ask that you sign this letter and return it to me* [Dr. Khan].
>
> \* \* \*
>
> . . . [I]f you do choose to sign this Agreement you must accept and sign this offer within seven (7) days from today, February 3, 2017. Again, you can email me a signed copy of this letter to me or to Dr. Madhu Jain at madhu@eastwest.edu.

2

\* \* \*

> If you decide to accept this Agreement, please sign and return this letter to me [Dr. Khan] on or before February 10, 2017.

[53-14] at 2–3 (emphases added).

Thus, to accept, the agreement required that Williams first sign the agreement and then either mail the signed agreement to Dr. Jain, email the signed agreement to Dr. Jain, email the signed agreement to Dr. Khan, or "return" the signed agreement to Dr. Khan.

Although the agreement had a space marked for a notary public, the terms of the agreement did not require notarization, nor did the terms of the agreement allow Williams to revoke the agreement after signing it. [53-14] at 3; [36] at 4.

Williams signed the agreement in the spot marked for the notary public and delivered a copy to a receptionist named Asha Jackson who worked for Dr. Jain's assistant, Deborah Deji, although the parties now dispute when Williams signed and delivered the agreement. *See* Pl.'s Resp. DSOF, [58] ¶¶ 44, 45. Jackson gave the signed agreement to Deji on February 10. Pl.'s Resp. DSOF, [58] ¶¶ 44, 45; PSOF, [58] ¶ 36. Deji is EWU's Human Resources Manager, and she reports to Dr. Jain and receives Dr. Jain's mail. Pl.'s Resp. DSOF, [58] ¶¶ 46, 47.

On February 10, 2017, EWU provided Williams with his final pay of $282.31. That same day, Williams wrote to Dr. Jain to complain about the amount. Pl.'s Resp. DSOF, [58] ¶ 50. He also sent the following message to Deji on LinkedIn: "Do not turn that termination form in I do not agree with it \*\*\* Hold it for me I want it back." [59] at 1; *see also* Pl.'s Resp. DSOF, [58] ¶ 52. Deji did not immediately respond to this message, and Williams followed up with another similar message. Pl.'s Resp. DSOF, [58] ¶ 54. Later that day, Deji responded to this second message, stating that she already knew and had kept the agreement. Pl.'s Resp. DSOF, [58] 55. However, Deji instead turned over the fully executed Separation Agreement to Dr. Jain. Pl.'s Resp. DSOF, [58] ¶ 56.

On February 17, 2017, EWU direct deposited $1,971.15, the amount due under the agreement, into Williams's bank account. Pl.'s Resp. DSOF, [58] ¶ 58. On that same day, Williams again messaged Deji: "Did you turn those papers in[?] . . . [T]hey still [are] not willing to pay me." [59] at 2–3. Deji responded that Williams had been paid for the week he worked, and told him "you'll get your severance pay next pay day.. [*sic*] I think next week." *Id.*

On February 21, 2017, Williams filed a second EEOC charge against EWU, alleging discrimination because of his race and disability and retaliation for filing

3

his October 2016 EEOC charge. Pl.'s Resp. DSOF, [58] ¶¶ 62, 63. On July 5, 2017, the EEOC sent Williams a right to sue letter. Pl.'s Resp. DSOF, [58] ¶ 64. Williams then brought this lawsuit. [1].

EWU moved for judgment on the pleadings as to all counts, arguing that Williams had released his claims by entering the separation agreement. On September 25, 2018, Judge Shah denied that motion, holding that (1) Williams could produce facts showing that he objectively manifested an intent not to be bound by the agreement, and (2) a reasonable person could conclude based on the pleadings alone that Williams did not intend to ratify the agreement. *See Williams v. E.-W. Univ.*, No. 17-cv-07092, 2018 WL 4591863, at *1 (N.D. Ill. Sept. 25, 2018); [36].

On February 28, 2019, Williams received his Notice of Deposition, which requested that he produce documents establishing that he repaid EWU's severance payment. On March 13, 2019, Williams issued two money orders totaling $1,971.15 to EWU. EWU did not cash these orders. Pl.'s Resp. DSOF, [58] ¶¶ 59–61.

After EWU filed the present motion for summary judgment, the case was reassigned to this judge.

## Discussion

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The Supreme Court instructs that Rule 56 'mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087 (7th Cir. 2018) (quoting *Celotex*, 477 U.S. at 322). In other words, to resolve this motion for summary judgment, the court "must determine what it is that [plaintiff] would be required to prove at trial," *Austin*, 885 F.3d at 1088, and ask whether "a reasonable jury" could find that he has met his burden of proof, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law—here, Illinois state law—controls which facts the plaintiff would have to prove at trial. *Austin*, 885 F.3d at 1088.

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex*, 477 U.S. at 323 (1986). After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quotation omitted). Construing the evidence and facts supported by the record in favor of the non-moving party, the court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not

4

speculative inferences in [its] favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.* (citation omitted).

I. **The Separation Agreement**

As in the prior motion for judgment on the pleadings, EWU argues that Williams's claims are entirely barred by a separation agreement connected to his termination. EWU argues both that Williams executed the agreement by signing it and delivering it to Deborah Deji, and that even if Williams did not initially accept the agreement, he ratified it after the fact by retaining EWU's $1,971.15 severance payment. As discussed below, Williams objectively manifested an intent to ratify the agreement and has not demonstrated the existence of a triable issue of material fact regarding that intent. Because Williams's discrimination and retaliation claims are barred by the terms of the agreement, the court does not reach the parties' arguments about the merits of those claims.

A. **Acceptance**

First, Williams argues that there is a disputed issue of material fact regarding when he signed and returned the agreement. EWU contends that on February 3, 2017, Williams executed the agreement and gave it to Dr. Jain's assistant, Deji. Williams testified that he signed the agreement on February 3. [53] ¶ 44. Williams also testified that he left it with Deji, although he did not clearly state on which day he did so, and Williams now alleges that he left it with Deji on February 9. Pl.'s Resp. DSOF, [58] ¶ 45.

Viewing the record in the light most favorable to Williams, a reasonable jury could decide that Williams delivered the agreement on February 9 rather than February 3,[2] but this dispute is not material as its resolution does not alter the

---

[2] EWU argues that Williams's amended complaint alleges that he signed the agreement and left it at the university on February 3, 2017, and that, consequently, Williams is bound by that allegation. *See Soo Line R. Co. v. St. Louis SW. Ry. Co.*, 125 F.3d 481, 483 (7th Cir. 1997) ("a party is bound by what it states in its pleadings"). But the amended complaint is not actually clear on this point. In relevant part, Williams alleged that after his termination, "Plaintiff vacated the building and left an unnotarized signed copy of the severance with a friend and colleague." [19] ¶ 32. This does not make clear whether Williams left the copy with Deji on the day of the termination; he could have vacated the building and then left the copy with Deji on a later date. Moreover, EWU answered this allegation by stating: "six days after the University offered Plaintiff one week to consider his separation agreement, Plaintiff signed the separation agreement, [and] left it as a package in the care of the security desk located on the bottom floor of the administration

court's analysis. The agreement gave Williams until February 10 to accept; Williams could have accepted the agreement on either February 3 or February 9. Moreover, the agreement did not allow Williams to revoke once he had accepted. The parties do not dispute that on February 10, Williams attempted to get the agreement back. Pl.'s Resp. DSOF, [58] ¶¶ 51, 53. If Williams already had accepted the agreement by delivering it on February 3 or 9, then this effort would simply have been an impermissible attempt to revoke the agreement. What matters, then, is whether there is a triable issue of fact regarding Williams's intent to accept the agreement by delivering it to Deji.

Williams argues that when he signed the agreement and gave it to Deji, he did not intend to accept the agreement by doing so. Instead, he gave the agreement to Deji for safekeeping while he continued to deliberate. The question is whether considering the circumstances, Williams's conduct objectively expressed an intent to accept. *See Steinberg v. Chicago Med. Sch.*, 69 Ill. 2d 320, 331 (1977) (an agreement will be found where the objective "conduct of the contracting parties indicates an agreement to the terms of the alleged contract" even if one of the parties has a "secret intent" not to agree) (citation and internal quotation marks omitted); Restatement (Second) of Contracts § 19 (1981) (a party is responsible even for an "unintended appearance of assent" if the party "negligent[ly] creat[es]" an objective appearance of assent). Neither Williams's signature nor his delivery to Deji necessarily proves acceptance. *See Chicago Title & Tr. Co. v. Ceo Corp.*, 92 Ill. App. 3d 58, 69–70 (1980) (a signed contract is not binding if the parties intended that that they would need to deliver the agreement in order to accept); *Passanante v. Callier*, 61 Ill. App. 3d 360, 364 (1978) (admitting evidence to show that a party "did not intend for the document to be delivered as a contract"). On the other hand, as Judge Shah noted in his prior order: "Often, one accepts the terms of a severance agreement by signing it and handing it to an HR representative." [36] at 9. Williams survived the motion for judgment on the pleadings in part because he alleged in his complaint that he told Deji not to hand in the form when he gave it to her; according to Williams, he simply gave it to her for safekeeping. At this stage, Williams must produce evidence from which a reasonable factfinder could decide that this is true.

Williams has produced this evidence, in the form of his own deposition testimony. Although Deji testified that she did not speak with Williams about his intent to accept the agreement prior to their LinkedIn messages on February 10, Williams contends that Deji's testimony is false, and that the two of them had prior conversations. He points to Deji's message stating: "I know, I kept it already." Williams argues that she would not have said "I know" unless they had already discussed the issue. Deji explained that she said "I know" in response to Williams's *second* message in order to communicate that she had seen the *first* one. [53] ¶ 55.

---

building." [23] at 8. Thus, EWU's answer indicates that Williams signed the agreement and left it with Deji on February 9, not February 3.

Nonetheless, Williams testified to the contrary that he did in fact have a previous in-person conversation with Deji about his intent. [53-2] at 109. This conflicting testimony creates a material dispute of fact that the court cannot resolve at summary judgment. *See Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) (a party may rely on "self-serving" deposition testimony to "present its side of the story at summary judgment"). EWU therefore has not carried its burden of showing that no reasonable factfinder could decide that Williams did not intend to accept the agreement by giving it to Deji.

### B. Ratification

EWU next argues that regardless of whether Williams accepted the agreement by delivering it to Deji, he ratified the agreement by accepting and keeping EWU's severance payment. Once again, the court must evaluate Williams's intent as objectively expressed through his actions. "The 'ratifying act must be such that reasonable minds would say that by [the party's] acts, he or she must have intended a ratification of the release.'" [36] at 10 (quoting 66 Am. Jur. 2d Release § 27). "It is well established that the retention of the consideration by one sui juris, with knowledge of the facts will amount to a ratification of a release executed by him in settlement of a claim, where the retention is for an unreasonable time under the circumstances of the case." *Golden v. McDermott, Will & Emery*, 299 Ill. App. 3d 982, 993 (1998) (citation and internal quotation marks omitted).

EWU argues that Williams ratified the agreement by retaining EWU's payment for an unreasonable amount of time. The parties do not dispute that EWU paid Williams $1,971.15 on February 17, 2017. Pl.'s Resp. DSOF, [58] ¶ 58. Nor do they dispute that Williams kept these funds until he first attempted to return them on March 13, 2019, over two years later. Pl.'s Resp. DSOF, [58] ¶ 60. To date, EWU has not cashed Williams's money orders. Pl.'s Resp. DSOF, [58] ¶ 61.

Williams argues that at the time of EWU's payment, he reasonably did not realize that EWU made a $1,971.15 payment under the agreement, since the payments came in "inconsistent deposit amounts." [61] at 7. Williams cites directly to printouts of his bank records, which show that Williams received $638.86 on February 17, 2017 from EWU. [60-1] at 4. However, EWU points out that this amount simply reflected the fact that, as a matter of consistent practice, Williams's direct deposits were split between multiple bank accounts. Williams's pay stubs from January 13, January 27, and February 17 support this argument. *See* Pl.'s Resp. DSOF, [58] ¶¶ 9, 48, 49, and 58; [53-15] at 2–3; [53-16] at 2; [53-19] at 2. EWU's payment under the separation agreement also follows this practice. Williams's February 17, 2017 pay stub shows a payment consisting of $1,971.15 in gross pay, and the net pay is split between two bank accounts, in amounts of $958.29 and $638.86. [53-19] at 2. Thus, Williams has not shown that there is a genuine issue of material fact regarding whether EWU's severance payment was inconsistent with its typical payment practices.

Williams also argues that during the week of the payment, he was "expecting multiple sources of funding" that included his federal and state tax refunds, his final pay period pay from EWU, and "refunded shares" from EWU, such that he did not specifically notice the February 17 payment. [61] at 5–6. Williams has not put forward any facts suggesting that he reasonably could have confused his payment from EWU for tax refunds (which likely would have been in different amounts and which, in any case, would have come from the state or federal government rather than from EWU), nor does he point to any facts in the record related to the alleged "refunded shares." Moreover, Williams wrote to Dr. Jain on February 10 regarding his displeasure with the amount of his final pay, indicating that Williams was fully aware of the payment for his final pay period. Pl.'s Resp. DSOF, [58] ¶ 50. Since Williams was aware of this payment, he could not reasonably have confused it with the subsequent February 17 payment.

Williams next argues that he discovered that he was in possession of the severance payment only "after the discovery process" and "consultation with his attorney." [61] at 6. Williams first attempted to return the money in March 2019. He argues that he "started making payments to his attorney's office" for this purpose starting in November 2018. But as EWU points out, Williams's own amended complaint states that the University "surreptitiously directly deposited funds it claimed was from an accepted severance agreement" in early 2017. [19] ¶ 46. This means that Williams knew he had the money at least as early as March 18, 2018, the date he filed the amended complaint. *See Soo Line R. Co. v. St. Louis SW. Ry. Co.*, 125 F.3d 481, 483 (7th Cir. 1997) (it is a "well-settled rule that a party is bound by what it states in its pleadings"). Even drawing all reasonable inferences in his favor, Williams kept EWU's payment for at least seven additional months with full awareness that the payment was made under the agreement. Williams does not attempt to explain why this seven-month delay was reasonable under the circumstances. *See, e.g.*, *Rohr Burg Motors, Inc. v. Kulbarsh*, 17 N.E.3d 822, 838–39 (1st Dist. 2014) (release ratified where defendant received check, cashed it, and did not return the proceeds); *cf. Shepherd v. Shepherd*, 408 Ill. 364, 379 (1951) (finding, in the context of ratification by a minor, that a seven-month delay is not a "reasonable amount of time"); *Golden*, 299 Ill. App. 3d at 993 (explaining, in the context of ratification after fraud, that any person who "accepts the benefits flowing from a contract for *any considerable length of time* ratifies the contract") (emphasis added) (citation and internal quotation marks omitted).

In sum, Williams has not demonstrated the existence of a triable issue of material fact regarding his intent to ratify the agreement. *See Fletcher v. Marshall*, 260 Ill. App. 3d 673, 675 (1994) (question of intent properly decided where there was "no evidence on record that could give rise to a reasonable inference" that defendant did not intend to ratify). By keeping EWU's payment for as long as he did, Williams objectively manifested an intent to ratify the agreement.

## Conclusion

The motion for summary judgment [51] is granted.

Date: September 30, 2021 /s/ Martha M. Pacold